SANGERS HOME FOR CHRONIC PATIENTS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CHARLES EKBLOM AND ELIZABETH SANGER EKBLOM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8984–74, 9110–74.    Filed April 11, 1979.

*Stanley Pressment*, for the petitioners.
*Richard M. Campbell*, for the respondent.

DAWSON, *Judge:* In these consolidated cases respondent determined the following deficiencies in the Federal income taxes of petitioners:

| Petitioners | Year | Deficiency |
|---|---|---|
| Sangers Home for Chronic Patients, Inc. ......................... | 1970 | $10,675.91 |

| Charles Ekblom and | | |
|---|---|---|
| Elizabeth Sanger Ekblom ......... | 1966 | 9,987.34 |
| | 1967 | 32,544.34 |
| | 1968 | 32,255.08 |
| | 1969 | 43,494.06 |
| | 1970 | 31,190.71 |
| | 1971 | 19,991.09 |

Upon agreement of the parties the Court severed the issue of whether Sangers Home for Chronic Patients, Inc., actually conducted the nursing home business and reported the income therefrom on its Federal corporate income tax returns for the years in question, thus preventing it under the doctrine of equitable estoppel from asserting that the taxable income from the business should have been reported by Elizabeth Sanger Ekblom as an individual proprietor from 1966 to May 4, 1967, and then by a partnership, Sangers Nursing Home, from May 4, 1967 through 1971.

### FINDINGS OF FACT

Some of the facts were stipulated and are found accordingly.

Sangers Home for Chronic Patients, Inc. (hereinafter referred to as petitioner), is a corporation whose principal place of business was located at 500 West 57th Street, New York, N. Y., at the time of filing its petition herein. Charles Ekblom and Elizabeth Sanger Ekblom (hereinafter referred to as Charles and Elizabeth), are husband and wife whose legal residence was 905 West End Avenue, New York City, when they filed their petition herein.

Sangers Home, Inc., was incorporated in 1936 pursuant to the stock corporation law of the State of New York. It filed United States Corporation Income Tax Returns for all taxable years of its existence from 1936 through 1976 which included income and losses from the operation of a nursing home.

Charles and Elizabeth filed joint Federal income tax returns for the years 1966 through 1971.

Elizabeth is the daughter of Robert Sanger, the founder of Sangers Home, Inc., who died in 1949.

Prior to 1949, Sangers Home, Inc., was owned three-ninths by Robert Sanger, two-ninths by Elizabeth, and four-ninths by a brother and sister of Elizabeth. In 1949, after Robert Sanger

died, his three-ninths interest was bequeathed to his wife Elizabeth's mother. The ownership of Sangers Home, Inc., did not change again until 1953 when Elizabeth became a seven-ninths owner and Charles became a two-ninths owner. From 1953 to the present the ownership of Sangers Home, Inc., has remained unchanged.

In May 1953, Sangers Home, Inc., purchased from Columbia University the land and building located at 500 West 57th Street, New York, N. Y., in which it had been operating its nursing home under a lease from Columbia University since 1945. The building and land are referred to herein as the nursing home building.

A proprietary nursing home business was conducted in the nursing home building from 1945 until August 4, 1977, when the business was terminated. The principal function of such business was to provide nursing services, but it also provided other services such as rehabilitation, recreation, and social service.

The city of New York licensed proprietary nursing homes to operate in that city from 1936 until 1973. In 1973, the State of New York superseded the city of New York as the governing body which was authorized to license proprietary nursing homes in New York City.

Sangers Home, Inc., was licensed to operate the nursing home business by the city of New York from 1936 to October 1954 when the city of New York no longer allowed corporations to be licensed to operate proprietary nursing homes. After October 1954, only individuals could be licensed to operate proprietary nursing homes.

From October 1954 to May 5, 1967, Elizabeth was licensed by New York City to operate the nursing home business, although she has never reported for Federal, State, or city income tax purposes any income or loss from the nursing home business as a sole proprietor.

On October 13, 1955, Elizabeth filed a Certificate of Conducting Business Under the Name of Sangers Nursing Home with the County Clerk, New York County, as required by the city of New York before she could obtain a license to operate the nursing home business.

The only reason a nursing home license was obtained in the name of Elizabeth was to comply with the legal restrictions imposed by New York City which prevented the corporation,

Sangers Home, Inc., from renewing its license. The nursing home business was not transferred to Elizabeth in 1954 as a result of her name being placed on the nursing home license.

One nursing home business in New York City had been forced to close when the single family member, in whose name the nursing home license was issued, became incompetent because of a stroke. The city of New York had refused to issue a new license to another family member unless substantial and costly improvements were made.

Charles decided that there should be a partnership between Elizabeth and Carole Eppinger (the daughter of Elizabeth and Charles, hereinafter referred to as Carole) and that Carole should become a colicensee with Elizabeth.

Charles was concerned about the continuity of the nursing home business and apparently believed that, if Elizabeth became incompetent, it would be easier for a colicensee, Carole, to renew an existing license rather than to have a new license issued by the city of New York.

Thereafter, from May 5, 1967, to August 4, 1977, Elizabeth and Carole were licensed individually to conduct the nursing home business under the name of Sangers Nursing Home, first by New York City, and then in 1973 by New York State.

On May 5, 1967, Elizabeth and Carole executed articles of copartnership in which they purportedly agreed to conduct the nursing home business as equal partners. These articles of copartnership were required to be filed with the Department of Health, city of New York, before a license could be issued in the name of both Elizabeth and Carole.

A Certificate of Partners Conducting Business Under the Name of Sangers Nursing Home was executed by Elizabeth and Carole on May 5, 1967. This certificate was required to be filed with the city of New York before a license could be issued in the names of both Elizabeth and Carole. Neither Carole nor Elizabeth has ever reported any income or loss for Federal, State, or city income tax purposes from the nursing home business as a partner.

No gift tax returns have been filed by Elizabeth transferring any part of the nursing home business to Carole.

As the nursing home administrator for Sangers Home, Inc., from 1953 until its closing, Charles was responsible for managing and supervising the operation of the nursing home. He was

also the dominant force in the business and made most of the major decisions. For example, he made all the decisions concerning union negotiations and problems without consultation or approval of the licensees. One of the two major factors that resulted in the closing of the nursing home was union problems.

Elizabeth, who was secretary-treasurer of Sangers Home, Inc., worked in the business office of the nursing home. For approximately 13 years prior to December 1971, Carole worked at the nursing home during her spare time on afternoons and weekends when her mother needed her help. In December 1971, she became a full-time employee of the nursing home.

Charles and Elizabeth, the owners of Sangers Home, Inc., attended many conferences with New York City officials concerning the operation and license of the nursing home. At these conferences Charles generally spoke for the nursing home. Carole rarely, if ever, attended any of these conferences.

One set of books and records was maintained for the nursing home business and the nursing home building, i.e., the books and records of Sangers Home, Inc., from 1936 to August 4, 1977, when the business was terminated.

The books and records of Sangers Home, Inc., had one surplus or retained earnings account from 1936 to the present date in which all the profit and loss from the nursing home business and the nursing home building was recorded. No dividends were ever paid from this account by Sangers Home, Inc. The books and records had one capital stock account with a balance of $3,000 from 1936 until the date of trial. The books and records never had any proprietary accounts which allocated all or any part of the profit and loss from the nursing home business to any individual or partnership. The general ledger of the nursing home business has always been entitled Sangers Home, Inc.

The books and records do not show any transfer of tangible or intangible assets of the nursing home business of Sangers Home, Inc., to any other individual or partnership in 1954, 1967, or during any other year of its existence.

Sangers Home, Inc., used two checking accounts in conducting the nursing home business. Checking account No. 240–1–023995, Chase Manhattan Bank (hereinafter referred to as the first checking account), was maintained in the name of Sangers Home, Inc., from 1947 to May 4, 1966. From May 4, 1966, to the date of trial, this account was maintained in the name of

Sangers Nursing Home. All the income and expenses in the operation of the nursing home business and all the expenses for the operation of the nursing home building have been deposited in and paid out of the first checking account, except for mortgage payments, interest, and taxes on the nursing home building which were paid out of checking account No. 240-1-033614, Chase Manhattan Bank (hereinafter referred to as the second checking account).

Although the first checking account was maintained in the name of Sangers Nursing Home with Chase Manhattan Bank after May 4, 1966, the bank continued to issue bank statements for this account in the name of Sangers Home, Inc., at least through 1973.

The authorized signatories on the first checking account were as follows:

| Dates | Authorized signatories |
|---|---|
| 1947 to 1949 | Elizabeth Sanger<br>Robert Sanger |
| 1949 to Aug. 15, 1966 | Elizabeth Sanger<br>Frieda H. Sanger<br>(Elizabeth's mother) |
| Aug. 15, 1966 to May 15, 1967 | Elizabeth<br>Charles |
| May 15, 1967 to trial date | Elizabeth<br>Carole |

The second checking account was maintained from May 12, 1966, the date it was opened, until the date of trial in the name of Sangers Home, Inc. The deposits to this account were made solely from the first checking account. Disbursements from the second checking account consisted only of payments for mortgage, interest, and taxes on the nursing home building. Charles and Elizabeth have been authorized signatories since the second checking account was opened, and Carole since April 26, 1974.

The income received and the expenses incurred in winding up the nursing home business were deposited in and paid out of the first checking account from August 1977 to October 1977. From October 1977 to the date of trial the income received and expenses incurred in winding up the nursing home business were deposited in and paid out of the second checking account.

Rent payments have never been made by the nursing home business for the use of the nursing home building, other than to Columbia University prior to the purchase of the nursing home building by Sangers Home, Inc.

A fair market rental under a net lease for the use of the nursing home building for each of the years 1966 through 1971 is $69,120. Under such a net lease the lessee would be responsible for all expenses attributable to the nursing home building.

The accounts payable in connection with the operation of the nursing home business were billed in the name of Sangers Home and Sangers Nursing Home.

Sangers Home, Inc., filed a New York City General Corporation Tax Report which included the income and loss from the nursing home business for all years that such a report had been required to be filed by the New York City tax laws.

Sangers Home, Inc., filed New York State Corporation Franchise Tax Reports which included the income and loss from the nursing home business for all taxable years of its existence (1936 to 1976).

All Quarterly Payroll Tax Returns (Forms 941) for the nursing home business were filed by Sangers Home, Inc., using the corporate taxpayer identification number (13–1261230).

All employee statements (Forms W–2) for employees of the nursing home business were issued in the name of Sangers Home, Inc.

The nursing home business reported to New York State for Medicaid purposes under the name of Sangers Nursing Home. The financial data submitted with the Medicaid reports made a computation of imputed rental for the use of the nursing home building by which it could compute the overall rate of return to the nursing home business, but otherwise did not make any separation between assets and income from the nursing home business and the nursing home building.

The computation of imputed rent was merely a calculation for medicaid purposes to determine its reimbursement to nursing homes that had made an investment in plant and equipment. It did not represent a separation between the nursing home building and the nursing home business for bookkeeping or other purposes.

An occupancy tax was collected by the city of New York from the nursing home business for the years 1966 to 1971, inclusive.

This apparently was based on some type of imputed rent determined by real estate taxes paid and other factors that comprised rent in the opinion of New York City.

Audited financial statements were prepared by a certified public accountant for Sangers Home, Inc., for the years 1970, 1971, and 1973. The income and loss from the conduct of all the nursing home business, i.e., from nursing services and the real estate, were included therein.

The nursing home business from 1936 to the date it closed on August 4, 1977, was known to the general public as Sangers Home, Sangers Nursing Home, or Sangers Home for Chronic Patients, Inc.

Law suits were brought by and against the nursing home business in the name of the respective licensee.

From 1936 to October 1954, the nursing home business communicated (by telephone, letter, or otherwise) with the city of New York, as licensing authority, through Sangers Home, Inc. After October 1954, the nursing home business communicated with the city of New York, as licensing authority, through Elizabeth; and from May 5, 1967, to August 4, 1977, the nursing home business communicated with the city and with the State beginning in 1973, as licensing authorities, through Elizabeth and Carole.

Petitioners (Charles, Elizabeth, and Sangers Home, Inc.) for the first time in September 1977, made a claim that Sangers Home, Inc., had not conducted the nursing home business since 1954. They claimed that the nursing home business was conducted by Elizabeth as a sole proprietorship from 1954 to May 4, 1967. From May 5, 1967, to August 4, 1977, it was claimed that Elizabeth and Carole conducted the nursing home business as a partnership under the name of Sangers Nursing Home.

The accountant for the business during the years in issue considered that the operations of the nursing home and the building were one business conducted by Sangers Home, Inc., and that integrating the books and records of the nursing home and the real estate business would be better for administrative and accounting reasons and would not have a substantial tax effect. After Charles retained his present tax counsel to represent his family and the corporate petitioner, he was advised by the attorney that the accountant's prior advice relating to the integration of the business was erroneous.

Respondent relied in good faith upon the United States Corporation Income Tax Returns filed by petitioners from 1954 through 1976 that represented Sangers Home, Inc., was conducting the nursing home business; and, because of respondent's good faith reliance thereon, the statute of limitations for assessment and collection of the deficiencies in the Federal income tax of Sangers Home, Inc., for the years 1966, 1967, and 1971 have expired.

If petitioners are now permitted to assert that the nursing home business was not conducted by Sangers Home, Inc., during the years 1966 through 1971, respondent will suffer a net detriment of $61,296, exclusive of interest, because of the expiration of the statute of limitations for the assessment and collection of deficiencies due by Sangers Home, Inc.

### ULTIMATE FINDINGS OF FACT

Petitioners are equitably estopped from asserting that Sangers Home, Inc., did not conduct the nursing home business for Federal tax purposes from 1966 through 1971, and the income or loss therefrom was properly reported on its corporate income tax returns.

### OPINION

Petitioners contend that the doctrine of equitable estoppel should not be applied here because the respondent has not shown a detriment in view of the "innocent mistake" made by the individual petitioners in relying on the erroneous advice of their accountant. Consequently, the Court is urged to decide on the facts whether the nursing home business was actually conducted as a sole proprietorship from 1966 to May 4, 1967, and thereafter as a partnership. To the contrary, respondent argues that the petitioners should be precluded through the application of equitable estoppel from asserting that the taxable income or loss from the nursing home business was not that of Sangers Home, Inc. It is respondent's position that he would suffer a net detriment[1] of $61,296 if petitioners are not estopped from

---

[1] A computation of the "net detriment" is as follows:

NET DETRIMENT TO RESPONDENT
Nursing Home Business Treated as a Partnership

Uncollectible Due to Expiration of Statute of Limitations

| | | *Deficiency* | *Refund* | *Total* |
|---|---|---|---|---|
| Sangers Home, Inc. | 1966 | $24,789 | | |
| | 1967 | 11,323 | | |
| | 1968 | 11,080 | | |

claiming that the corporation operated the business since 1954. He contends that there was good faith reliance on the corporate Federal income tax returns and, as a result of such reliance, the assessment and collection of any deficiencies against Sangers Home, Inc., for the years 1966 through 1969 and 1971 are now barred by the statute of limitations. We agree with the respondent.

The doctrine of equitable estoppel[2] generally applies where the taxpayer makes a representation of fact on which the Commissioner relies to his detriment, and, through such reliance and his ignorance of the true facts, is induced not to correct the error before its correction is barred by the statute of limitations. In 3 J. Pomeroy, Equity Jurisprudence, sec. 804 (5th ed. 1941), equitable estoppel is defined as:

the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part

|  |  |  |  |
|---|---|---|---|
|  | 1969 | 12,756 |  |
|  | 1970 | S/L open |  |
|  | 1971 | 24,730 | $84,678 |
| Less: |  |  |  |
| Elizabeth Ekblom | 1963 | $6,534 |  |
|  | 1964 | 5,841 |  |
|  | 1965 | 2,124 |  |
| Carole Eppinger (Total tax paid for all closed years) | 1964 | 0 |  |
|  | 1965 | 39 |  |
|  | 1966 | 4 |  |
|  | 1967 | 578 |  |
|  | 1968 | 540 |  |
|  | 1969 | 628 |  |
|  | 1970 | 2,053 |  |
|  | 1971 | 1,333 |  |
|  | 1972 | 1,305 |  |
|  | 1973 | 2,403 | 23,382 |
|  | Net detriment | | 61,296 |

These deficiencies and refunds are based on the assumption that the individuals, as operators of the nursing home business, would pay an arm's-length rental to the corporation which owned the property where the business was conducted. Such a rental would make the business a losing venture in the hands of the individuals but would make the realty a more profitable investment for the corporation.

[2]For an extensive discussion of equitable estoppel in tax cases, see H. Dubroff, "The United States Tax Court: An Historical Analysis, Part VII, The Jurisdiction of the Tax Court," 42 Alb. L. Rev. 446–451.

acquires some corresponding right, either of property, of contract, or of remedy.

The elements usually required for its application are: (1) Conduct amounting to a misrepresentation or concealment of a material fact; (2) actual or imputed knowledge of the misrepresentation by the party to be estopped; (3) absence of knowledge of facts by the party in whose favor estoppel is applied; (4) intention or expectation of the party to be estopped that the representation or concealment will be acted upon by the other party; (5) reliance by the party seeking the estoppel; and (6) detriment to the party seeking the estoppel resulting from his reliance. See 10 J. Mertens, Law of Federal Income Taxation, sec. 60.02 (1976).

All of the elements of equitable estoppel are present here. The first element was met by the petitioners' filing of corporate income tax returns covering the operations of the nursing home business for over 40 years. The second element was met by the petitioners' testimony that they knew the business income was reported on the corporate returns. The third element was met because respondent had no knowledge until December 1976 that an individual or partnership might have conducted the nursing home business. The fourth element was met because no evidence was presented that the corporate returns were filed without any intention that respondent should rely thereon. The returns were required to be filed by law and were submitted under the penalties of perjury. The fifth element was met since respondent relied on the corporate returns filed and did not know that petitioners claimed otherwise until amended pleadings were filed. At that time the statute of limitations for the years involved barred the assessment and collection of additional taxes. The sixth element was met upon the showing that respondent would suffer a loss of $61,296 if petitioners are not estopped from changing their position.

The Supreme Court said in *Higgins v. Smith*, 308 U.S. 473, 477 (1940): "A taxpayer is free to adopt such organization for his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages." Petitioners seek to disclaim the corporation's validity for Federal tax purposes. This they cannot do. See *Maletis v. United States*, 200 F.2d 97 (9th Cir. 1952); *Halstead v. Commissioner*, 296 F.2d 61 (2d Cir. 1961); *Phillips v. United States*, 193 F.2d 132 (5th

Cir. 1951); *Haag v. Commissioner*, 59 F.2d 514 (7th Cir. 1932), affg. 19 B.T.A. 982 (1930); *Lofquist Realty Co. v. Commissioner*, 102 F.2d 945 (7th Cir. 1939), affg. a Memorandum Opinion of this Court; *Weigman v. Commissioner*, 47 T.C. 596, 605–606 (1967), affd. per curiam 400 F.2d 584 (9th Cir. 1968). The practical reason for such a principle is that otherwise a taxpayer could begin doing business as a corporation and, if everything goes well, realize the income tax advantages therefrom. But if things do not turn out so well, he may turn around and disclaim the business form he created in order to realize a loss as his individual loss. As the Court of Appeals said in *Maletis v. United States, supra* at 98:

The burden is on the taxpayer to see to it that the form of business he has created for tax purposes, and has asserted in his returns to be valid, is in fact not a sham or unreal. If in fact it is unreal, then it is not he but the Commissioner who should have the sole power to sustain or disregard the effect of the fiction since otherwise the opportunities for manipulation of taxes are practically unchecked. * * *

Under circumstances like those present herein the respondent is entitled to take the petitioners as they have represented themselves to be, and they "cannot play fast and loose, now you see it, now you don't, with the government." *Phillips v. United States, supra* at 133.

The doctrine of estoppel was held applicable in two analogous cases, both decided initially by this Court. In *Haag v. Commissioner, supra,* it was held that where a taxpayer represented she was a member of a partnership and the Commissioner, relying thereon, confined his investigation to the correctness of the partnership earnings which permitted the statute of limitations to expire against the true partner, the taxpayer was estopped from denying her partnership status. In *Lofquist Realty Co. v. Commissioner, supra,* it was held that where the taxpayer had misrepresented the facts in its return and the Commissioner had relied thereon, it was estopped from changing its position after the statute of limitations had run to the Commissioner's detriment.

Petitioners argue that equitable estoppel cannot be applied

here because respondent has suffered no detriment as a result of a waiver they make in their opening brief.[3] This waiver is worth about $20,000, assuming that certain overpayments can be refunded. Even with the waiver respondent would suffer a net detriment of $41,000. Without the waiver respondent would suffer a net detriment of about $61,000. Thus, respondent would not be made whole by the petitioners' waiver, and we are not inclined to allow them a tax windfall of at least $41,000 due to their misrepresentations to respondent.

Accordingly, we sustain respondent's position on the severed issue in holding that application of the doctrine of equitable estoppel precludes the petitioners from asserting that the taxable income and losses of Sangers Home for Chronic Patients, Inc., for the years 1966 through 1971 should have been reported first by an individual and then a partnership rather than by the corporation. The corporate petitioner has always conducted the nursing home business, and the income therefrom was properly reported on its Federal income tax returns.

*An appropriate order will be entered.*

---

[3]Petitioners have waived "all rights to refunds as a sole proprietorship and partnership for any of the tax years by which the respondent is foreclosed from asserting deficiencies against the corporate petitioner because of the statute of limitations."